## THE KELLYVILLE COAL COMPANY

*v.*

## DESIRE STRINE.

*Opinion filed October 24, 1905.*

1. APPEALS AND ERRORS—*when facts in negligence case are not open to review.* Any evidence in the record tending to sustain the cause of action alleged in a personal injury case justifies the trial court's refusal to direct a verdict for the defendant, and a judgment for the plaintiff, affirmed by the Appellate Court, conclusively settles all controverted questions of fact.

2. CONTINUANCE—*when refusal to grant a continuance is not prejudicial error.* Refusal to grant a motion for a continuance, supported by an affidavit showing the unavoidable absence of one of the defendant's witnesses and what his testimony was expected to be, is not prejudicial error, where the plaintiff admits the facts to which the absent witness would have testified.

3. MINES—*contributory negligence no defense to an action for a willful violation of Mines act.* Contributory negligence by the plaintiff in going into a room in the mine with notice of the dangerous condition thereof is no defense to an action based upon defendant's willful failure to examine the room and mark the same as dangerous and to furnish props and timbers, as required by sections 16 and 18 of Mining act of 1899. (Laws of 1899, pp. 315, 317.)

4. SAME—*miner may rely upon compliance by operator with statute.* Although a miner may have notice that an overhanging rock in a room is loose and dangerous, yet if there is no mark made by the mine examiner to indicate that it is dangerous, he may assume that the operator, through the mine examiner, has made the examination required by statute and deemed it unnecessary to mark the room as dangerous.

5. SAME—*willful violation of Mines act means conscious violation.* Willful violation by a mine operator of the provision of the Mines and Mining act means conscious failure to observe it, even though no evil intent induces the failure.

6. SAME—*whether willful failure to observe Mines act was the proximate cause of injury is for the jury.* It is a question of fact for the jury whether the mine operator's willful failure to comply with the provisions of the Mines act relative to inspection and marking of rooms was the proximate cause of the injury, even though the injured miner had notice, through other means, that the conditions where he worked were dangerous.

7. EVIDENCE—*right of experienced miners to testify as to fitness of props.*  As bearing upon the point urged by the defendant in a mine injury case that the plaintiff might have used certain bent and broken timbers for props by sawing them off, it is not error to permit experienced miners to testify as to whether the use of such bent and broken timbers was a proper method of propping the roof.

8. INSTRUCTIONS—*reference to ad damnum is not improper.*  It is not improper for an instruction, in an action for personal injury, relating to the method of estimating the amount of damages, to state that the jury may award such damages, "not to exceed the amount claimed in the declaration, as the jury may believe, from the evidence, he has sustained by reason of such injury."

9. SAME—*the plaintiff is not bound to anticipate every possible defense in framing his instructions.*  In framing his instructions the plaintiff need only correctly present the law applicable to his theory of the case which there is evidence tending to prove, and is not bound to anticipate and negative every possible defense.

10. SAME—*an instruction couched in language of statute is not improper.*  In an action for willful violation of the Mines act, an instruction for the plaintiff couched in the language of the statute relative to the duties of a mine examiner as thereby laid down is not improper.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Vermilion county; the Hon. M. W. THOMPSON, Judge, presiding.

This is an action in case under the mining statute to recover for injuries, sustained by a fall of rock from the face of appellee's working place, known as room No. 11 on the third west entry off the second south main entry in mine No. 2 of appellant, on January 19, 1903, at about 10:30 o'clock A. M.  The declaration alleged the injuries to have been sustained through willful failure and neglect of appellant to comply with the statute.  In the trial court appellee recovered judgment for the sum of $2000.00, from which an appeal was taken to the Appellate Court, where the judgment has been affirmed.  The present appeal is prosecuted from such judgment of affirmance.

The declaration consists of four counts, of which the first, second and fourth allege that appellee required props and cap-pieces to prop and support the roof of the room, in which he was employed in mining coal; that he did not have any; that on January 17, 1903, and on prior days, he ordered props and cap-pieces; that defendant willfully failed to deliver them, and that, in consequence thereof, a large rock fell from the roof of appellee's room, striking him with great force, dislocating certain vertebra in his back, and otherwise injuring him.

The third count of the declaration alleges that it was the duty of the defendant to have its mine examiner inspect all places, where men were expected to pass or work, to see whether there were any unsafe conditions, and, where such were found, to place a conspicuous mark as notice to all men to keep out; that there was a large, loose rock in the roof of appellee's room, which formed an unsafe condition; and that on January 19, 1903, the mine examiner willfully failed to inspect the room and place a conspicuous mark thereat as notice to all men to keep out, and that, by reason of such failure to mark, and, while in the usual course of his employment as a miner in said room, the rock fell and struck him, dislocating certain vertebra in his back-bone, and otherwise injuring him to his damage in the sum of $20,000.00.

As is said by the Appellate Court in their opinion deciding this case: "The evidence discloses that appellee had been working in appellant's mine for about five years; that some six months prior to the accident he and his step-son had turned a room known as No. 11, which at the time of the accident was thirty feet in width and seventy-five feet deep from the side of the entry. On Saturday afternoon, January 17, 1903, appellee fired two shots in the room, and then quit work. Over the place, where the shots were fired, was what is known as a 'roll,' which projected out into the room five or six feet from the face of the coal and extended clear across the room. On resuming work on Monday morning, the 19th,

appellee, upon sounding the roof, discovered that a bit of the rock, forming the roll, was loose. At about 10:30 o'clock, while appellee was on his knees, endeavoring with a pick to remove the coal under the roll, which the shots had failed to throw out, and which was about four and a half feet deep, a piece of rock about eighteen inches thick fell upon and injured appellee.

"The evidence shows that timbers at mines are furnished only in even-foot lengths, and nearly all upright timbers used at this mine are seven feet in length, while cross-bars or horizontal timbers are nine feet in length. In other words, the length of the upright timbers depends upon the thickness of the vein of coal, and the length of the horizontal timbers depends upon the width of the entries, and the width of the room-necks. Props are used both in entries and rooms, but cross-bars are used only in entries and room-necks, or narrow passages.

"The evidence further shows that if, by reason of a horseback or roll occurring in the roof, a little longer timber is required, it was the custom of the miners, without making a special order for a longer timber, to put a cap-piece or wedge over the top of the prop and sometimes one under the bottom also, thus lengthening the timber seven or eight inches, and where the timber is too long the miners themselves either dig a place in the fire-clay at the bottom, or cut a piece off of the timber, so that they can use it."

Appellee's evidence tends to show that appellee and his step-son, Ernest West, about seventeen years old, who were working together in the room in question—the latter being called appellee's "buddy"—"on the morning of the accident had no timbers in the room, and that they went out upon the entry and up and down the entry for a long distance on each side of their room, and could find no timbers to prop and timber this loose rock, or the roll in their room; that there were none either in the entry or in the room, except three cross-bars or nine-foot timbers in the neck of their room,

one of which had been broken, and the other two had been bent by the weight of loose slate that came down upon them, and that they had taken these timbers down and thrown them to one side, and that the same were not fit to cut and use as short props to support this loose rock or roll in their room; * * * that they had ordered timbers from one Farley, the timberman, on the Saturday previous to the accident, but that none were delivered to them; that, if they had been furnished timbers, they could have propped the roof so as to have prevented the falling of the rock; that timbers were usually delivered to them at the side of the switch track in the neck of the room or on the side of the entry next to the room-neck."

The evidence of the appellant tends to show "that, at the time of the accident, there were sufficient and suitable timbers either in the room, room-neck, or in the entry adjacent thereto, to properly prop the roof."

Upon the question whether the mine examiner had made an examination of the room in question on the day of the accident before appellee entered it, the testimony of appellee tends to show "that the first thing they did, when they entered the room on the morning in question, was to look for chalk-marks; that they examined both the roof and timbers, and found none of any kind, except the figures '17' on a timber about twenty-four feet from the face of the coal, which referred to the examination of Saturday, the 17th."

The evidence of the appellant tends to show that the mine examiner "examined the room on the morning of the accident, and, finding the rock loose, wrote with chalk on the face of the roll figures indicating the day of the month, and also a cross-mark, but that owing to the dampness of the room chalk-marks would not show as distinctly as in a dry place."

H. M. STEELY, for appellant.

SWALLOW & SWALLOW, for appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The first, second and fourth counts of the declaration charge a willful failure to deliver timbers to appellee upon his order, and that such willful failure was' the cause of the accident and injuries sustained by him. The evidence under these counts was conflicting. The issues under the third count were, whether or not there had been a failure by the appellant company to have the room examined by its mine examiner on the night preceding the accident, and whether or not there had been a failure by said examiner to place a conspicuous mark thereat as notice to all men to keep out. The evidence upon the issues under the third count was also conflicting. There was evidence, however, tending to sustain the cause of action under all the counts, and therefore, under the repeated rulings of this court, no error was committed by the trial court in refusing to instruct the jury to find for the defendant below. The questions of fact are all settled by the judgment of the circuit court in favor of plaintiff below, and the judgment of the Appellate Court affirming the same. The only questions, therefore, which remain for our consideration, are questions of law.

*First*—Before the beginning of the trial in the court below the appellant made a motion for a continuance of the cause, and filed an affidavit in support thereof. The court refused to grant the continuance, and this refusal is assigned as error. Appellant proposed to show by a witness, named Crayton, who was absent in Indiana on account of sickness, that he was in appellee's room in the mine shortly before the accident occurred and discovered that the rock, which afterwards fell upon the appellee, was loose and dangerous, and called appellee's attention to it, and told him that it was dangerous, and advised him not to go under it. The declared object of the appellant was to prove by this absent witness, that appellee not only had notice of the defect, but also had notice that it was a dangerous defect. The court did not err

in refusing the continuance, because the testimony of the absent witness, if he had been present and testified, was immaterial in this kind of a case. And not only was this so, but the result could not have been affected by the proposed evidence of Crayton, inasmuch as appellee admitted that, before the accident, he had knowledge of the condition, which Crayton was to testify to.

Section 18 of the act of April 18, 1899, "to revise the laws in relation to coal mines and subjects relating thereto, and providing for the health and safety of persons employed therein," provides that "a mine examiner shall be required at all mines. His duty shall be to visit the mine before the men are permitted to enter it, and, first, he shall see that the air current is traveling in its proper course and in proper quantity. He shall then inspect all places where men are expected to pass or to work, and observe whether there are any * * * unsafe conditions. * * * As evidence of his examination of all working places, he shall inscribe on the walls of each, with chalk, the month and the day of the month of his visit. When working places are discovered in which * * * any dangerous conditions exist, he shall place a conspicuous mark thereat as notice to all men to keep out, and at once report his finding to the mine manager. No one shall be allowed to remain in any part of the mine, * * * nor to enter the mine to work therein, except under the direction of the mine manager, until all conditions shall have been made safe. The mine examiner shall make a daily record of the conditions of the mine, as he has found it, in a book kept for that purpose, which shall be preserved in the office for the information of the company, the inspector and all other persons interested, and this record shall be made each morning before the miners are permitted to descend into the mine." (4 Starr & Curt. Ann. Stat.—sup. ed.—p. 857). Section 4 of the old Mining law of 1879 required the mine to be examined, though it did not provide for the giving of a warning by a mark at the place of danger. (2 Starr &

Curt. Ann. Stat.—2d ed.—p. 2719). Section 16 of the Mining law of 1899, provides that the mine manager shall visit and examine the various working places in the mine as often as practicable; and that "he shall always provide a sufficient supply of props, caps and timber delivered on the miners' cars at the usual place when demanded, as nearly as possible, in suitable lengths and dimensions for the securing of the roof by the miners, and it shall be the duty of the miner to properly prop and secure his place with materials provided therefor." (4 Starr & Curt. Ann. Stat.—sup. ed.—p. 855). Section 16 of the Mining law of May 28, 1879, provided that "the owner, agent or operator of every coal mine shall keep a supply of timber constantly on hand of sufficient length and dimensions to be used as props and cap-pieces, and shall deliver the same as required, with the miner's empty car, so that the workmen may at all times be able to properly secure said workings for their own safety." (2 Starr & Curt. Ann. Stat.—2d ed.—p. 2730).

In construing the mining laws of this State, including the sections above quoted and referred to, this court has always held that "mere contributory negligence on the part of a miner will not defeat a right of recovery, where he is injured by the willful disregard of the statute either by an act of omission or commission on the part of the owner, operator or manager. To hold that the same principle as to contributory negligence should be applied in case of one, who is injured in a mine, because the owner, operator or manager totally disregarded the statute, as in other cases of negligence, is to totally disregard the provisions of the constitution, which are mandatory in requiring the enactment of this character of legislation, and would destroy the effect of the statute and in no manner regard the duty of protecting the life and safety of miners." (*Carterville Coal Co.* v. *Abbott,* 181 Ill. 495). If the appellee went under the overhanging piece of coal, knowing that it was loose and dangerous, all that can be said of his conduct is that he was guilty of con-

tributory negligence. As, however, contributory negligence on the part of the injured miner is not regarded as a defense, so as to defeat a recovery in this class of cases where there has been a willful disregard of the statute by failure on the part of the company to furnish suitable props and cap-pieces when they have been demanded, or to make a suitable and proper examination and inspection when the same was necessary, then the mere fact, that appellee had notice of the condition of the overhanging piece of coal was immaterial, and the refusal of the court to continue the cause, in order to obtain testimony to prove such notice, was not error. Indeed, appellant could not have been prejudiced in any way by overruling the motion for a continuance, because appellee admitted that he knew the condition of the rock.

*Second*—Counsel for the appellant makes an attack upon the cases decided by this court, which hold that contributory negligence on the part of an injured miner is no defense under the circumstances above stated, and quotes from cases decided in other States, which hold to the contrary. We are not disposed to recede from the decisions of this court upon this subject, and, in view of our adherence to these decisions, much of the argument of counsel and much of his criticism upon the instructions, given by the court below, need no further notice. Section 33 of the act of 1899 provides that "for any injury to person or property, occasioned by any willful violations of this act, or willful failure to comply with any of its provisions, a right of action shall accrue to the party injured for any direct damages sustained thereby." (4 Starr & Curt. Ann. Stat.—sup. ed.—p. 865). Section 14 of the act of 1879 contained a similar provision. (2 Starr & Curt. Ann. Stat.—2d ed.—p. 2728). In *Catlett* v. *Young,* 143 Ill. 74, this court had under consideration a requirement of the act of 1879, and in connection therewith construed said section 14, as above quoted, and referred to the previous cases of *Bartlett Coal and Mining Co.* v. *Roach,* 68 Ill. 174, and *Litchfield Coal Co.* v. *Taylor,* 81 id. 590, and in the *Catlett*

*case* it was held that the very object to be attained by the statute, requiring the shaft in a coal mine and the entrance thereto to be fenced, is to prevent injuries to persons employed in a coal mine, so that negligence on their part in the manner of doing their work shall not prove fatal to a recovery for an injury suffered by them, and in the case of *Catlett v. Young, supra,* we said that the legislature "intended that, in case of injuries occasioned by any willful violation of the act of 1879, or by willful failure to comply with any of its provisions, the right of recovery should not depend upon the exercise of ordinary care by the person injured, or the deceased, or be precluded by contributory negligence. This view of the law, as matter of course, is based on the ground that there has been a willful failure to comply with the requirements of the statute. If the statute has been complied with, or if the injury is not occasioned by the willful violation or willful failure denounced by the statute, but by some other alleged negligence of the mine owner, and the person injured or killed fails to exercise ordinary care, then there would be no right of action."

In *Carterville Coal Co. v. Abbott, supra,* the question again arose, and the holding of the court was based not only upon section 14 of the act of 1879 above quoted, but upon section 29 of article 4 of the constitution, which is as follows: "It shall be the duty of the General Assembly to pass such laws as may be necessary for the protection of operative miners by providing for ventilation, when the same may be required, and the construction of escapement shafts, or such other appliances as may secure safety in all coal mines, and to provide for the enforcement of said laws by such penalties and punishments as may be deemed proper;" (1 Starr & Curt. Ann. Stat.—2d ed.—p. 138;) and in construing section 14 in connection with said constitutional provision we said (p. 501): "By this latter section, for an injury to person or property, or for loss of life, occasioned by a willful violation of any of the provisions of the act providing for

the health and safety of persons employed in coal mines, the operator is made liable in damages. An enactment such as this, which is in force by the mandatory requirement of the constitution, is of the gravest import and of the highest character, and must necessarily be construed in connection with the constitutional provision requiring the enactment. Where so large a number of persons are engaged in a productive industry as in coal mining in the State of Illinois, and where the work is of such a character that it is recognized as being attended with unusual hazards and dangers, the constitution requires that legislation shall be had for the purpose of protecting those thus engaged from the known extraordinary hazards and dangers. In the construction and equipment of mines, therefore, the act requires the discharge of specific duties, so that the utmost safety can be extended to the miners. This requirement of the constitution is sought to be met by this legislation, which directs the owner, operator or manager to make provision for the safety of the miners employed within the mine. Where an owner, operator or manager so constructs or equips his mine that he knowingly operates it without conforming to the provisions of this act, he willfully disregards its provisions and willfully disregards the safety of miners employed therein. Where such owner, operator or manager willfully disregards a duty enjoined on him by legislation of this character, and places in danger the life and limbs of those employed therein, he cannot say that, because one enters a mine as a miner with knowledge that the owner has failed to comply with his duty, he is guilty of contributory negligence." The same doctrine has been announced in the following cases: *Pawnee Coal Co.* v. *Royce,* 184 Ill. 402; *Odin Coal Co.* v. *Denman,* 185 id. 413; *Western Anthracite Coal and Coke Co.* v. *Beaver,* 192 id. 333; *Spring Valley Coal Co.* v. *Rowatt,* 196 id. 156; *O'Fallon Coal and Mining Co.* v. *Laquet,* 198 id. 125; *Willis Coal and Mining Co.* v. *Grizzell,* 198 id. 313; *Donk Bros. Coal Co.* v. *Stroff,* 200 id. 483; *Riverton Coal Co.* v. *Shepherd,* 207 id. 395;

*Marquette Third Vein Coal Co.* v. *Dielie,* 208 id. 116; *Spring Valley Coal Co.* v. *Patting,* 210 id. 343.

*Third*—When the appellee entered the mine, although he had had notice that the overhanging piece of coal was loose and dangerous, yet, seeing no mark made by the mine examiner to indicate that it was dangerous, he had a right to assume that the operator, through the mine examiner, had obeyed the statutory requirement, and made the necessary examination, and found it unnecessary to make the mark in question.   In *Pawnee Coal Co.* v. *Royce,* 184 Ill. 402, we said in reference to this statute: "It is true that plaintiff's own testimony shows that an examination was made, but it is not true that with the making of that examination the duties of appellant ceased.  The law goes further, and provides that 'no person shall be allowed to enter the mine until such examiner shall have reported all of the conditions safe for beginning work.' * * * Nor does it make any difference that plaintiff did not look for the record, under the facts of this case.  Whether he relied on the statute or on the promise of appellant to repair, he had the right to assume that the appellant would keep its promise, and he also had the right to assume that it would comply with the statutory requirement, and was not bound to ascertain each morning whether it was doing so."   In this class of cases the doctrine above announced in regard to contributory negligence also applies to assumed risk.  In *Spring Valley Coal Co.* v. *Patting,* 210 Ill. 343, we said: "This court has held that contributory negligence is no defense to an action against a mine owner, if an injury results to a miner by reason of a willful violation of the Mines and Miners act, (*Western Anthracite Coal and Coke Co.* v. *Beaver,* 192 Ill. 333,) and we think the same reasoning applies to the doctrine of assumed risk.  The statute expressly requires the mine owner to furnish a sufficient light at the top and bottom of the shaft to insure, as far as possible, the safety of persons getting on and off the cage. To excuse the mine owner from a compliance with said stat-

ute, upon proof of the fact that the miner knew the mine owner was violating the statute, would be to repeal the statute."

*Fourth*—A willful violation, within the meaning of the statute, signifies a conscious violation. (*Marquette Coal Co. v. Dielie,* 208 Ill. 116). In *Odin Coal Co. v. Denman,* 185 Ill. 413, we said: "There was no evil intent operating to induce the failure, but that element is not a necessary ingredient of willfulness, within the correct meaning of the word 'willful' as employed in this statute. * * * An act consciously omitted is willfully omitted, in the meaning of the word 'willful,' as used in these enactments of our legislature relative to the duty of mine owners." It is, however, contended upon the part of the appellant that the negligence of appellant, or its willful violation of the statute either as to examination or furnishing props, was not the proximate cause of the injury to appellee. Instructions given for both parties to the jury required them to believe from a preponderance of the evidence that the willful violation of the statute was the cause of the injury. Whether or not negligence of the appellant was the proximate cause of the injury was a question of fact for the jury, and they have settled it against appellant. (*Missouri Malleable Iron Co. v. Dillon,* 206 Ill. 145, and cases there cited.)

The theory of appellant upon this subject seems to be this: that, although the appellant may have been guilty of a willful violation of the statute by failing to make the examination required, or to furnish the props and cap-pieces demanded, yet that the negligence of appellee, in going under the rock after he had had notice that it was loose, operated as a new and independent force to break the causal connection between the original wrong and the injury. That is to say, the contention of appellant is that the alleged negligence of appellee, as above indicated, was the proximate cause of the injury, and that the willful violation of the statute by appellant was not the proximate cause. If this theory should

prevail, then the rule, that the defense of contributory negligence cannot be set up in actions of this kind, would be rendered abortive and ineffective. The doctrine does not apply here that "the party, who last has a clear opportunity to avoid the accident, notwithstanding the negligence of his opponent, is considered solely responsible for it." If the jury believed from the evidence, that appellee would not have been injured but for the negligence of appellant in failing to make the examination, and in failing to indicate the danger by a mark, then they were justified in finding that appellee's injuries were occasioned by the willful negligence of the appellant within the meaning and intention of the statute. Appellant claims that the material question was, whether the appellee had notice of the defect or not, and its contention is that, if he received notice from any source, it made no difference whether or not the examiner made the necessary mark, required by the statute, or not, upon the theory that the object of making such mark was merely to give notice. This view cannot prevail in view of the fact that the miner has a right to presume that the absence of the mark indicates an examination on the morning in question by the mine examiner and the opinion by the latter that the rock was not dangerous. The material fact is that, if the examiner had placed the required mark upon the roof of the coal room to indicate the danger, appellee would not have gone under the roof, in order to remove the coal upon the floor of the same for the purpose of putting the prop under it. The very fact, that the miner has the right under the statute to demand the props, and the mine manager is under obligation to furnish the same, is proof that the miner regards the props as necessary. If the props are necessary, then the miner must know that there is some degree of looseness in the pieces of coal in the roof of the coal room, which requires the placing of props thereunder. It cannot be said, therefore, that, even though he has some knowledge as to the looseness of the coal, his working in the room with such knowledge is such negligence

217—34

as amounts to a proximate cause of the injury, so as thereby to release the operator from liability.

*Fifth*—It is assigned as error by the appellant that the court below made improper rulings in regard to the admission and exclusion of evidence. The chief complaint is, that the court permitted the introduction of certain expert testimony in regard to the fitness of certain timbers or cross-bars to be used as props to support the loose roof of the coal room. The appellee claimed that he and his step-son, who was working with him, needed certain props and caps for the purpose of supporting the roof, and that they demanded the same, and that they were not furnished. It is contended on the part of the appellant that there were certain timbers or cross-bars in the neck of the room, which could have been used by appellee and his assistant as props and cappieces. It seemed that the neck of the room had been timbered by three cross-bars, or had had three cross-bars in it, and, that after they had been placed there, they sank down by the weight of the roof, which loosened above them and bore them down far enough to break one, and bend the others. They had to be removed on that account, and were laid down upon the floor of the room in one corner, as we understand the evidence. The appellant contended that the appellee and his assistant could have made these timbers fit for props, and could have used them as such by sawing or cutting them off. The space between the roof of the room and floor was about four and a half or five feet in height, whereas these timbers were some seven or eight feet long, or perhaps longer. Certain witnesses were asked as to the practicability of using these cross-bars for the purpose of propping the roof. It is said by appellant that, after the timbers had been described as to length, size and condition, it was a matter of common knowledge whether or not they could be cut and used, and that expert testimony upon this question was not proper, upon the alleged ground that such testimony allowed the witnesses to usurp the functions of the

jury, and draw conclusions, which it was the province of the jury to draw from the evidence describing the timbers. In other words, it is claimed by the appellant that what was said by the witnesses upon this subject was upon a matter not within the proper domain of expert evidence. Undoubtedly it is a general rule that the opinions of witnesses are inadmissible as evidence, and that they are to testify to facts, but the jury are to draw the inferences and form the opinions, which are to govern the case. (*City of Chicago* v. *Mc-Given,* 78 Ill. 347; *Hughes* v. *Richter,* 161 id. 409). It is to be observed, however, that such men, as usually sit upon the jury, are not versed in such matters, and have no common knowledge or information concerning the hazardous employment of mining coal, or the use of timbers and the methods of looking after the roof in a mine. For this reason, we are not prepared to say that experienced miners may not be allowed to give their testimony as to matters of this kind.

It has been held that miners may state in evidence what caused the cracking or settling of the walls of a mine, and whether it is safe to have only a narrow space between the tram-cars and the mine walls; and it may be shown by experts that there is no method known to miners, by which the danger from falling stones can be entirely obviated. (12 Am. & Eng. Ency. of Law,—2d ed.—442, and cases in notes). "A miner's evidence is admissible as to the proper method of timbering a drift, and also a shaft in a mine." (Ibid. p. 443; *Grant* v. *Varney,* 21 Colo. 334). In the latter case it was said: "Witnesses for the plaintiff were permitted, over the defendants' objection, to state, in substance, what was the proper method of timbering a drift run in such ground as the evidence shows this one penetrated. Counsel for defendants now say that such questions permitted the witnesses to state what the jury were, as a matter of fact, to find from the evidence, and that the opinions of the witnesses were not admissible. The witnesses were not allowed

to state whether or not this drift, with the timbers fifteen or sixteen feet from the breast, was safe. They spoke only as to the proper way to timber it. We think there was no error in this." So, in the case at bar, the witnesses were not asked as to the safety of using the timbers or cross-bars in question, but simply as to whether the use of such bent and broken cross-bars was a proper method of propping the roof of the mine. In *Donk Bros. Coal and Coke Co.* v. *Stroff,* 200 Ill. 483, where a witness had testified to facts intended to qualify him to give an opinion as an expert as to the timbers necessary to make the roof of a mine secure at a certain point, and he had said that there ought to have been four props on each side and a cross-bar, and that there were only two props and a cross-bar there, we said in that case in regard to this testimony: "We see no reason why an expert miner should not be allowed to express an opinion as to the number of props that would be required to prevent the slate in question from falling in."

*Sixth*—Appellant also complains that the court did not permit it to ask appellee's step-son certain questions upon his cross-examination as to a prior injury received by appellee. There was testimony, tending to show that appellee's eye-sight had been affected, and that his mind was affected, and that he suffered pain when he tried to work, but that he had been sound physically and his mind had been in good condition prior to the injury received by him in appellant's mine. The step-son was asked certain questions for the purpose of showing that, several years prior to the present injury, appellee had fallen off a bridge, and sustained injuries by reason of such fall, with the evident purpose of showing that the fall from the bridge, and not the accident in the mine, had caused the injuries from which he was suffering. The court refused to allow the witness to answer these questions upon cross-examination, because it was new matter that had not been gone into by the direct examination. Whether the ruling of the court in this respect was correct

or not, appellant could have suffered no injury therefrom, for the reason that appellant was permitted to call out all the facts in relation to the previous injury from other witnesses, and was thereby permitted to show, or to attempt to show, to what extent, if any, the injuries of the appellee may have been caused by the fall from the bridge.

*Seventh*—Appellant also complains of the action of the court in the giving and refusal of instructions. Objection is made to the giving of the tenth instruction, given by the trial court for the appellee, which related to the method of estimating the amount of plaintiff's damages, and by it the jury were told that they might "give the plaintiff such damages, not to exceed the amount claimed in the declaration, as the jury may believe from the evidence he has sustained by reason of such injury." It is said that by the use of the words "not to exceed the amount claimed in the declaration," the court referred to the *ad damnum* mentioned in the declaration, and thereby expressly invited the jury, in case there was a verdict for the plaintiff, to award large damages. It is said that, inasmuch as the *ad damnum* in the declaration was $20,000.00, the jury would think from this statement in the instruction that the court thought the damages ought to be large, as it specifically called the attention of the jury to the *ad damnum*. The true rule in regard to this subject was stated in *Central Railway Co.* v. *Bannister,* 195 Ill. 48, where it was said: "To our minds there is no objection whatever to an instruction for the plaintiff in an action at law, because it refers to the amount sued for, or limits the right of recovery to the amount claimed in the declaration, unless there is something in the instruction which tends to lead the jury to understand that they ought to or may allow the full amount so claimed." There is nothing in the language, used in the tenth instruction here under consideration, which tended to lead the jury to understand that they ought to allow the full amount claimed in the declaration. Such was the character of the instruction given in *Chicago,*

*Rock Island and Pacific Railroad Co.* v. *Austin,* 69 Ill. 426, referred to by counsel, and where the court told the jury "that by the statute of Illinois, the plaintiff in this case can not recover more than $5000.00, and if they believe from the evidence that the plaintiff is entitled to recover, they will render a verdict for no more than that amount."

In *Muren Coal and Ice Co.* v. *Howell,* 204 Ill. 515, similar instructions were referred to, which contained the language here under consideration, or similar language thereto. But the main defect, which was condemned in the instruction in the *Howell case,* was, not that it referred to the *ad damnum* mentioned in the declaration, but that the instruction failed to restrict the jury to the legal rule of damages, and permitted them to enter into an open field of investigation rather than determine the amount of the damages from the evidence in the case. We are of the opinion that the tenth instruction in the case at bar, given for appellee, was not erroneous for the reason stated.

*Eighth*—Objection is also made to the third instruction, given for the appellee, upon the alleged ground that the jury were thereby told that the miner was the sole judge of the kind of timbers he should use, and upon the further ground that it ignored one of the defenses of the appellant to the effect that there were timbers in the room, and timbers out upon and along the entry, independent of the three timbers in the room-neck, that could have been obtained and used as props. The instruction is not justly subject to the criticisms made upon it. In *Western Anthracite Coal Co.* v. *Beaver,* 192 Ill. 333, where the claim was made that, under the evidence, there was present in the mining room timber of sufficient length and dimensions to be used as props and cap-pieces, with which the rock could have been secured, it was said: "The statute should have a reasonable and liberal construction and one which will accomplish its purpose. We are of the opinion the miner must be the one to determine the length and dimensions of the props and cap-pieces which

he deems necessary to properly secure the roof for his own safety. If he orders six and one-half foot props, the owner or operator has not complied with the statute, when he has furnished props, which must be spliced or sawed in two before they can be used." The language of the statute is that the mine manager shall provide "a sufficient supply of props, caps and timber delivered at the miners' cars at the usual place when demanded, as nearly as possible in suitable lengths and dimensions for the securing of the roof by the miners." It is the language of the statute itself that the timbers furnished shall be of suitable length and dimensions. The instruction, however, distinctly told the jury that they must condition their finding upon several considerations, and also upon the belief from the preponderance of the evidence that the timbers in the neck of plaintiff's room were rejected timbers that had been taken down from the neck of his room, and had lain there for some time, and that they were broken or bent or cracked, and that they were not suitable timbers to use in plaintiff's room. In other words, the jury, by the terms of the instruction, were to determine themselves from the evidence whether the timbers in question were suitable or not. As to the complaint that this instruction, and a number of other instructions commented upon, ignored some of the defenses of the appellant, it is sufficient to say that "the plaintiff is only obliged to present the law correctly in his instructions applicable to his theory of the case, and is not bound in every instruction to anticipate and exclude every possible defense." (*Mt. Olive and Staunton Coal Co.* v. *Rademacher*, 190 Ill. 538, and cases there referred to). Several instructions were given for the appellant by the court below which present to the jury in positive and comprehensive terms the various defenses set up by the appellant. An examination of the instructions, given for the appellant, will show that its theories were presented to the jury in unequivocal language. The instructions, when taken together as a series, are free from prejudicial error. The ninth instruc-

tion, which is objected to, called the attention of the jury to the duty of the mine examiner to inspect plaintiff's room and observe its unsafe condition, and to place a conspicuous mark thereat as notice to all men to keep out of said room, etc. The instruction was couched in almost the exact language of the statute, and "where an instruction is given in the language of the statute it must be regarded as sufficient, because laying down the law in the words of the law itself ought not to be pronounced to be error." (*Mt. Olive and Staunton Coal Co.* v. *Rademacher, supra; Donk Bros. Coal and Coke Co.* v. *Peton,* 192 Ill. 41).

Appellant complains of the refusal of some of the instructions asked by it. The substance of many of such refused instructions was embodied in instructions, which were actually given for appellant. Some of these refused instructions ignored the doctrine already announced, that contributory negligence is not a proper defense in cases of this kind under the circumstances already detailed, and for this reason these instructions were properly refused.

Other objections are made to the instructions which have been carefully considered, but we deem it unnecessary to further notice the same, as such objections are answered by the considerations already presented. The court gave for the appellant twenty-two instructions. Of these, two were modified in certain respects, but no complaint is made of such modification. These instructions presented the case to the jury from every point of view taken by the appellant, and many of them were exceedingly favorable to the appellant. The jury were fully and liberally instructed, and the series of instructions, considered as such, contains in our opinion no reversible error.

Accordingly, the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*